One of your honors, Mayor Fetter, for Mr. No. We're now back here to address some of the... Mislead us once again? Lead us down the garden path? I'll do my best, Your Honor, to... That's all right. Don't worry about it. I'm used to going down that path. It's very comfortable. Well, we did our best to avoid having to address the questions that the Court reserved in its earlier decision because of the simpler and more categorical approach that this Court took the first time. But obviously the Supreme Court has made relevant all the underlying questions about what deferences do the... We know where we are, Mr. Fetter. You're now a minute into your time. Let's get down to brass tacks. Well, let me start with what has been referred to loosely here as the continuing violation theory. The State relies heavily on a case that we think actually supports our position, and that's the Knotts v. Davis case involving an attorney who was barred by corrections from communicating with or visiting clients. And what happened in that case is the attorney wanted to say that the initial decision barring her is not when her cause of action accrued, but rather every time she got a denial. And this Court said, no, it was the decision barring her, but the key point there that I think the State overlooks but that this Court emphasized is that she received a formal decision permanently barring her, and the Court said actually I think twice in the opinion that it was the letter permanently suspending her and not earlier letters that she had received provisionally suspending her. That was when her cause of action accrued. What were the – exactly what were the restrictions that were placed on your client? Well, my client was restricted primarily from participating in what are referred to as special programs, and the record doesn't make 100 percent clear at this point what the special programs were, but a lot of those involve religious observances and vocational programs and things of that nature. He was also prohibited from communicating with a particular volunteer who had worked at the prison. Was he handed a written list of restrictions? To the best of my knowledge, he was not. Again, the record, the complaint here doesn't indicate that he was handed anything in writing or any formal determination. I should point out that it's the defendant's burden here to show a lack of exhaustion, and there wasn't anything introduced here to show that there was any. Why is that? Why is that? That is because of authority that we cited in our original briefing on this, where this Court has held, and the case name is slipping my mind, that the burden of showing a lack of – it's an affirmative defense. It's not something where the plaintiff has a requirement. Was that a PLIA case? Yes, it was, Your Honor. And I apologize for not having the citation at hand. Well, you can. We'll give you a little gum sheet right at the end. Thank you, Your Honor. And what you have here is a situation where we're up in a posture where the district court, based on the defense argument, ruled that there was no exhaustion. Before you go on, this is sort of important. So your position is your client comes to district court. I'm not trying to – just tell me if you disagree with me. If I do, yes. If you do, just to make sure I understand the process. Your client brings a suit in district court, and he's entitled to bring the suit. If they have an issue with exhaustion, they have to raise it as an affirmative defense. And they have to say this suit is barred because of exhaustion, and here is the proof that it was non-exhaustion. Is that your position? Yes. It is not the other way around that your client has to come in and say, I'm bringing a suit, I'm a prisoner, obviously the PLRA applies to me, and here's my proof that I've met the statutory requirements by exhausting. Yes, Your Honor. I think in this case that – So any absence of evidence, in your view, as to the triggering event, as to when the violation started, would fall upon defendants. Is that your position? Yes, Your Honor. Okay. And I think – When exactly is your view – and I realize you've got a continuing violation argument, which I don't want to distract you from too much, but I think we do understand what that argument is. But when, in your view, did the restriction commence? What was the original triggering event? The original triggering event, according to what was pleaded, was the deputy warden indicating at – apparently at some meeting in December of the year before the complaint was – or the grievance was filed about six months before. Years are important and dates are important. Are we talking 2000 now? I believe we are. Let me just refer so that I don't – Okay. First of all, do you remember when he was put in the slammer? In administrative. It was in 2000, yes. In 2000. At some point, something happens. He gets caught, or he gets apprehended doing something in the chapel or something, and – Or at least that's what prison – Something happened. They grabbed him. They thought he was doing something wrong. Yes. They put him in administrative segregation. Yes. And two months later, he comes out of that. Yes. Okay. Do you remember what is the date when he was put in administrative segregation? Yes. It's October 26, 2000. October 26. So the triggering event could not have been any earlier than October 2000. Correct. There must have been some event subsequent to that. Yes. And it could have happened while he was in administrative segregation. Now, let's say the triggering event took place while he was in administrative segregation. Do we have anything on this record to tell us whether or not he would have been able to file an appeal while he was in administrative segregation? We don't. But my best understanding of the record is that it was actually not while he was in administrative segregation that the restrictions were imposed. So at some point, too, he gets released. Yes. And there is some communication at a later point in time that say, you know, we couldn't really prove it against you, but you've had a bunch of restrictions imposed. And that's a letter sent to him by the ombudsman. I don't think it was a letter that was sent to him. There was a letter that says that. I'm trying to piece together what we actually have. I was thinking, doesn't the letter from Kenneth Hurdle, July 9th, 2001, say that? This is at, well, I won't wear this. It's in my book. Do you know what letter I'm talking about? I mean, don't. This is a letter from the ombudsman, Kenneth Hurdle. As you know, an investigation was conducted as to inappropriate behavior between certain religious volunteers and CDC inmates. Although the original allegations were not sustained, enough information was developed to indicate that an over-familiar relationship had developed. In fact, based on a recent conversation with the warden, additional inappropriate behavior by volunteers was discovered. I personally reviewed the first investigation and gave the findings. I will review the additional information later this week. In discussion with my acquaintance, it was determined that some restrictions had been implemented to prevent further inappropriate behavior. So this letter, at the very least, is the end point, right? I mean, at the very latest, he would have been notified by this time. He would have been notified about the restrictions, Your Honor, but would not have been notified even by that, necessarily, that there was a permanent restriction. In other words, if he had a suspension from special programs, that he would not have had reason to believe that would be made permanent. And that's the difference from the case that the State is relying on. In the Knox v. Davis case, the letter that was received expressly said that there was a permanent restriction or permanent suspension, and so the decision was made then. What we have in my client's case is something that was of indefinite duration. When he wrote to the deputy warden to get it lifted, it seems to have been referred to someone else, and then no further decision was received. And so you don't have the same kind of one-time decision that triggers, you know, where the claim accrues once and for all. And when did he actually file his grievance? He filed his grievance in June of 2001. Okay, so this letter comes afterwards, July 9th. Yes. So if this is a favoring event, you don't care, right? Right. Is it correct that he was never told what the scope of his restrictions were or the time limit? Well, it's just kind of vague, wasn't it? Yes, at least. I mean, again, this is not based on a developed evidentiary record. This is based on some fairly spare claims that are included in the record here because this was litigated in the district court just based on the notion that he hadn't gone through the last two levels of the appeals process, which, as this court noted, he wasn't able to. The state was not at the time litigating the correctness of the decision by the appeals coordinator not to accept the claims for filing. At the time, they were just saying, well, because he didn't do the further appeals, it got. So, therefore, we have this relatively undeveloped record that doesn't fully specify exactly what everyone knew at what time. And Mr. Cain never, he just kind of left it in limbo. He never granted, never looked into it. It was just kind of forgotten and went away. That's what appears to have happened. He didn't know what was going on. How is Mr. Cain to know? Well, you're fine. Well, just the fact that, as far as he knew, he was suspended from participating in these programs. Well, he was told he could participate in recreational programs in a memorandum dated April the 13th. Right. 2001 from the deputy warden. And then he was told in that letter that Nine Hoots, the community resources manager, would review the request to participate in any other program. And if you have any additional questions, direct them to Nine Hoots. But he never heard. Right. And it was when he didn't hear from Nine Hoots that he filed his grievance. For quite a period of time. Two months approximately. And then he filed his grievance. And then he's told, well, your 15 days have run up. Exactly. So you're out in the cold. Yes. Yeah. And that's the way the case was handled. Yes. We really don't have a very good record here. No. And to the extent that we do, I mean, we don't think that this gave him a meaningful opportunity to challenge what was going on. And we also think that the determination by the appeals coordinator just not to file the thing was something that was an inappropriate application of the rules. And if that were an appropriate application. Who is this appeals coordinator? What is? It's an official within the prison. What training does that official have? That is not clear from the record. Certainly the record doesn't indicate that there is anything approaching a level of training that you would normally associate with administrative officials who are authorized to make decisions the courts have referred to. The fact is we don't know. Right. The record doesn't tell us, but we don't really test the credentials of IJs or ALJs either. Well, except that there is a certain understanding that, I mean, if you had things that were. . . Well, we're not federal agency officials. We don't ask the question of whether or not when we're reviewing administrative action, whether the guy who signed the regulations really went to law school or. . . It's not a particularly. . . At least with the federal agency, you have something where the agency as a whole and the head of the agency is ultimately responsible for the decision. Here you couldn't even get an appeal up to any responsible officials within the grievance system or within corrections because he just wouldn't file them. It's the equivalent of a court saying this can't be filed, and so no one can appeal the decision. So you don't have the same reasons for pursuing a regularity. There's no one there that can start considering whether you have a continuing violation and whether a stop will apply and all that. Yes, Your Honor. They just count the days. Yes. You didn't raise a stop on your brief, so you're abandoning that as a possibility? Well, again, I mean, I think that the posture this came up in was one where we were not appealing a decision that rested on the notion that the appeals coordinator's decision was correct. We were appealing something that was on the basis simply that he hadn't gone to the second and third level of appeal. This only came up as the State's alternative argument for affirming the dismissal. So there was not an occasion in the initial appeal to fully rehearse all of the theories. But I think that certainly I don't know whether you would need to call it a stop, but all these issues I think come into play in determining whether this was an available remedy under the PLRA and whether Mr. Noe had a meaningful opportunity to avail himself of it. He was still waiting for a decision. He was told he wanted to play baseball. They said, you can participate in recreational programs. And then for the rest of it, for those other programs, any other program, he turned it over to this resource manager, which would certainly lead him to believe that whatever the decision was, as far as his participating in programs, wasn't final. It was still part of it. He got permission to play baseball and recreational activities. But as far as these other programs, like going to church and going to these, I think, something like anger management or something of that nature, that still awaited a decision by the resource manager. So there's nothing final. Right. So when he really took it on himself to interpret this two-month delay, he said, well, nobody's responding to me. And I guess that's it. And that's when he took those forms and filled them out. Yeah. Nobody seems to have interpreted this initial suspension decision as kind of a one-time forever decision until the appeals coordinator did in June, when he said you had to file your grievance back then. Everyone else appeared to be treating it as something that was subject to being listed. In flux, yeah. Yes. I'm talking about clerks not filing things. I don't know how you got this passed by a clerk's office, but it doesn't have a certificate of compliance. You're familiar with FAB 32 and the requirement of certificate of compliance? Maybe a brief? Yeah, but my recollection is that that only is triggered if your brief is longer than 30 pages. Well, your recollection is poor. Yeah. And did you know there's a footnote, too, on page 20? Does it not appear to you to be 14 point type? No, Your Honor. Okay. Do you read these briefs before you file them? Yes. Before you sign your name to them? I certainly do. Okay. Now, you check on the rule, and if it's required that you file a certificate of compliance, you'll do that? Yes. Okay. At the very least, you need to certify that the font size complies. And if you sign a certificate, I would expect you to go through and read and make sure it does. I'll do that, Your Honor. All right. You've got one strike against you. Well, actually, probably two. Size and the absence of the certificate. Always good to read these, Your Honor. I apologize. What? You'll correct the problem, right? Yes. Okay. Thank you. Will you nevertheless give him a minute or two for a bottle, Mr. Ferguson? Give him what? A minute or two for a bottle. Oh, yeah. I'm very kind today. Thank you, Your Honor. Mr. Ferguson is always very kind. All right. Good morning. And may it please the Court, Deputy Attorney General Kenneth Roost for defendant's appellees. Did you argue the last time, too? This is a new introduction. 178 days Mr. Noh waited before filing his administrative grievance in this case. Oh, yes. What was the triggering event? Well, he has admitted. The judge said, doesn't he ask you if you argued this case before? No, this is my first time appearing in the case, Your Honor. 171 days. I just didn't remember. I know that Mr. Feder was here the last time. I just don't remember who was. My first grieving. And Mr. Noh, in this case, has admitted clear notice of the decision against him in his complaint, stating that on December 22, 2000, What decision was against him? Decision restricting him from special programs. How was he notified of that? He quotes in his complaint that he was explicitly restricted by Mr. Cain from participating in any special programs. Well, did he get a written notice? This was an oral notice, so far as the record shows. Is that a good way to run a prison? How many prisoners are in St. Quentin? The formality of the procedures that are required before us, we don't know. The evidentiary record isn't developed because Mr. Noh did not avail himself of the administrative appeals system. However, even if he were to require it. But this is important. So you're saying he conceded actual notice as of December? The excerpts of record, page 10, in his own complaint, Your Honor. I'm sorry. Page 3 of his own complaint. The excerpts of record, page 3. In the excerpts of record, page 10, he notes that there were confidential sources providing evidence supporting that. I don't hear called excerpts. Is this what you're referring to? Appellee's excerpts of record. Appellee's excerpts of record. I don't have those. Why don't you read me what it says? I can provide you a copy. Appellee's Supplemental Excerpts of Record. Yeah, sure. Do you have them handy? I do. Are these from the original appeal? That's correct, Your Honor. Page 3 of that document. When he was told orally, was he told the scope of the restrictions and how long it would last? Your Honor, that is not in the evidence before us. However. How does he know how long it lasts? He waited 88 days before writing. Waited 88 days to know what? He was told that he was, quote, explicitly restricted from special programs until told otherwise that a decision he could only assume would be for perpetuity until it's reconsidered. In this case, it was reconsidered. He wrote to the Associate Warden, Defendant Kane, 88 days after being informed of the first decision on December 22nd. And in Kane's reply, he said, yes, you can participate in recreational programs. You can play baseball. But I'm not reconsidering my decision. You can take it up with the resource manager to review the decision. Did the resource manager ever do anything? Mr. Noe never took it up with the resource manager so far as we know in the evidence. Mr. Noe waited another 66 days before filing his first administrative grievance in this case. What does the administrative guy do in the meantime? Received no appeals, Your Honor. This is parallel, actually. He was supposed to get back to him. And he said, I've authorized community resource manager to review your request to participate in any other program. And the letter goes on to say, if you have any questions, take them up with the resource manager. Instead, he waited 66 days before taking it up with an administrative appeals coordinator, which is the problem. I read that. As I read that, I understood that to mean that the resource manager was going to look into this and get back to him. The resource manager has the authority to review the decision, Your Honor, which is just like in the decision of Knox v. Davis, which Mr. Noe's counsel has pointed out. In that case, Monica Knox received clear notice that she was first barred from all visitation and correspondence privileges with her inmate client. He made a request to the warden on recreational activities, and I think he asked to participate in other programs. And he said, you may participate in recreational programs. But I've asked the resource manager to review your request to participate in other programs. Yes, Your Honor. Well, that would mean to me, and I think it's a reasonable reading of that, that I'm going to have this guy look at it and he'll get back to you and tell you whether you can go to church and whether you can go to these other meetings and whether you can do this or do that. Decisions are made and decisions are enforced. In Monica Knox's case, her decision was looked at and reviewed, and an exception was made for her after the first notice that this court noticed. She was allowed to continue to visit with her client, Lucky, an inmate on death row. When the warden sent him this letter, did he say see and cite to that case? No, Your Honor. Okay. Was that case available to him? In the law library? Yes. Monica Knox occurred years after this instance. But throughout all continuing violation case law, the crux is notice, not the formality of the notice. Mr. No concedes notice in his complaint. How did he know there would be a denial? What piece of paper or who told him, we deny, besides the timely one? That's, again, not in the evidence, but presumably any correctional officer would have provided the denial. But no one did. Is that correct? The only denial we have on the record is the letter to Associate Warden Cain, who said you can review the decision with the resources manager. The decision was never rescinded. It was in effect for the first 88 days until the writing of that letter, and for 178 days Mr. No sat on his hands since December 22nd, 2000, before filing an administrative grievance. Your argument is that it would go on forever as long as he was in there for life, so those restrictions are there for life. That's correct, Your Honor. Mr. No waited 178 days. I think in this instance any question of timeliness is moot. He had 21 calendar days with which to submit an administrative grievance concerning a decision, which was clearly delivered to him. He gives no justification for this delay. He asserts no impediments to the administrative appeals process, and he admitted to clear notice of this decision. So your view is that he needs to be told about a particular action. He doesn't have to be told about the full scope of that operation. I mean, he can grieve anything, right, so it doesn't have to be a restriction. In this case it happens to be a restriction, but it could be administrative segregation or some other, or he could be restricted from seeing visitors, for example, yes? Yes, Your Honor. That can happen. And so long as somebody says you've been restricted from seeing visitors, that's good enough, even if they don't tell him you've been restricted. First of all, orally is enough in your view. Yes, Your Honor. And second of all, there's no need to tell him of the duration or the scope of the restriction. Actually, Your Honor, I have two responses for that. First off, he says the decision … He doesn't know? I think he should know of the scope. And in this case, he says he was explicitly told of the decision restricting him. He can only presume if he doesn't ask, doesn't express any ambiguity. That's answering a question different from the one I asked. You can do that if you want, but that's not going to give me an answer to the question I asked. Do you remember my question? I do. Your Honor, scope is relevant in knowing whether or not you're going to have to contest a decision. However, given the evidence before us, Mr. No never expressed any ambiguity as to how long this would occur. He waited, probably programmed well for 88 days, and asked Mr. Cain if he would reconsider the decision. Let me just make sure, just in case I get quoted again, I just want to make sure I get my question out. Is it your view that notice has to include notice of the scope of the restriction? It should, Your Honor. That's a weasel answer. Yes, Your Honor. Does it have to give him notice of the scope or not? I think depending on the impact of the decision. Yes or no? Yes, Your Honor. Okay. And you agree, and again I don't want to put words in your mouth because I want it to be your answer, which you're bound by, that the duration of a restriction is an important part of the scope. It's not a trivial aspect of it. Absolutely, Your Honor. Okay. So if, for example, the facts were in this case that he was told you are restricted, I don't exactly know what language they would use, but he would be told you are restricted from special programs, and he wasn't told that this would be forever, you would agree that that notice would not be adequate? If the notice implicitly was forever until reconsidered, I would say that he has no standing to raise it 178 days later, Your Honor. Okay. But that's not my question. Do you remember my question? I do, Your Honor. Okay. Let me ask for an answer to my question. Yes, Your Honor. Do you remember it? I do think that the scope of the question. If you remember the answer, if not, I'm happy to ask it again. My answer is yes, Your Honor. So yes, meaning that duration is an important significant material aspect of the restriction of which you would need to be informed for there to be adequate notice. Yes? Yes, Your Honor. Okay. Now, I looked at the complaint here, and there's nothing here that he admits as to duration. He does seem to admit that he knew there was a restriction, and he lays out in a fair amount of detail as to what the restriction involves, but he doesn't say anything as to duration. Are we agreed on that? Yes, Your Honor. Okay. And here's where you get to look temporized. And do you think this is not a problem because? Mr. Noe never expressed any ambiguity as to duration. He never contested in his letter to the warden, the associate warden, in his letter. I understand, but why does that matter? You have said that duration is material. Right. And he was not, at least as the record shows, not told about duration. Now, maybe on remand, maybe he was told, but at least as far as this record shows, he was not told about duration. So I assume you're not saying, yes, we need to remand to figure out whether he was told about duration. If you are, then you say yes, and you can sit down, and we're done as far as I'm concerned, at least. But I assume the answer is no, and I'd like to know why not. For two points, Your Honor. I think the decision in Mr. Noe's words to be explicitly told he's denied has an error of perpetuity that until reconsidered, it would be interpreted as permanent. Mr. Noe waited his own time, 88 days, before readdressing the matter with the associate warden, and then after the response informing him that the decision was still in place, 66 days until submitting his administrative grievance. Now, he must properly proceed through the administrative grievance procedures, and without time deadlines, they become meaningless. Well, you know, but the letter that the memo he got from the warden on the 13th of April, that indicates, or at least indicates to me, or arguably indicates, that these restrictions were not permanent. The warden, first of all, said you can go play baseball. And then he said he tells the authorized knee house to review the request to participate in any other program. And so that certainly implies that we're not dealing with any in perpetuity restrictions. And, you know, he's a prisoner. He sits there and waits. He doesn't want to maybe irritate these people by, you could argue that, by asking for a decision. You've got this. Why don't you call me? Why don't you let me know? He's not going to do that. He's just going to wait. He's going to try to be a good boy and hope that he's restored to some of these programs that he likes to participate in. Why isn't there a continuing violation every day? Every day he wants to do these things. Every day he can't. Well, just as in the case of Monica Knox, Mr. Noe was hoping that his decision would be reconsidered. And Monica Knox's decision was reconsidered. An exception was made. It was in perpetuity until reconsidered, and then it was. But this Court still looked to the original letter. Ms. Knox had notice of all the wrongful acts she wished to challenge at the time of the suspension letter because it informed her that she was denied a visitation and male privileges. That's the moment of notice and accrual, which is clear in this case. And the case law for providing an exception to continuing violations is when this is evaded. What's clear in this case? Tell me again. His statement that he was explicitly restricted by Mr. Cain from special programming. All right. On December 22nd, 2000, 178 days before subpoenaed grievance. Did he ask Mr. Cain in writing, can I go back and play baseball? 88 days later, Your Honor. What? 88 days later, Your Honor. Why is that important if it's 88 days later? Because he'd already missed his administrative grievance deadline of three weeks by the time 88 days had passed. And even if we say that this reconsidered or retriggered. So he writes, he communicates with Cain, and he says, can I play baseball? And Cain says, yeah, go ahead. Play baseball, and Niehaus is going to review these other requests of yours. It's important also to note in the letter, Mr. Noe distinguished recreational programs from the special programs he was barred from. What's the difference? Can I play baseball and is the ban on special programs? Can you lift it? What's the difference? What's recreational and what's the other? Baseball is recreational. The special programs were the special religious programs he was denied of because of his alleged sexual misconduct with a state volunteer at the Catholic chapel. They decided there was nothing to that, right? They couldn't prove it. They had confidential sources providing evidence. Nothing provable, but enough. In a prison, they must enforce their safety and security. And restricting Mr. Noe from special programs that he has abused is a sensible and within their jurisdiction thing to do. And as to why this isn't a continuing violation, Mr. Noe's counsel himself points to Pace Industries, a case in antitrust. Which states that statute of limitations is only restarted by separate violations within the limitations period that are not controlled by the previous act or decision. The key here. So we're now in antitrust law. That was an analogy that Mr. Noe's counsel brought up for the point of continuing violations when they apply. It's when they're separate independent decisions, but reinforcing a single decision which was never adjusted, never changed in Mr. Noe's case. Would you say the state officials in part contributed to the problem by having rules that are so vague no one can understand them? And also sending that report on April 21st saying we'll get back to you? Your Honor, Title 15 is published and given to every inmate. And it's very clear it's the rules and procedures that must be followed. I'm asking about the officials carrying out the rules. You got the rules, but in the way they carried them out, particularly that letter, I think it's April 21st, where he said we'll get back to you. Doesn't that kind of state kind of participated in causing whatever this problem is? Actually, that's easily distinguishable, Your Honor. The proper procedural administrative procedure for submitting an administrative appeal is on a form 602 to the appeals coordinator. You don't informally write to the associate warden. It's surprising you got a response at all in this case. He had 15 working days, three weeks, to submit an administrative grievance to the appeals coordinator on a form 602. Why did Mr. Kane write and say I'll have my coordinator get back to you? What was the point of that? He allowed Mr. Noe to take the decision directly up with the resources manager if he wanted to reconsider a decision. And the resource manager didn't do anything? He didn't change the decision, Your Honor. So didn't the resource manager in some way contribute to the problem we have here today? The problem was Mr. Noe's continued denial of access to special programs. The question is didn't he in some part contribute to the problem we have today? I think the problem of any vagary on the record is entirely on the shoulders of Mr. Noe, because he didn't create an evidentiary record by pursuing the proper procedural grievance that was available. Vagary? Do you know what that term means? It means different things in different circumstances, Your Honor. But when we're talking about- It actually has an English meaning, you know. It has nothing to do with vagueness. Right. Go ahead. Are you going to ask me to- Don't ever use that word again. Noted. Perpetually. At least not in that way. So let's say we wind up disagreeing with you, and we think that there was insufficient notice here of that continued violation, and that the appeals council was wrong, or the appeals board was wrong in dismissing the appealers untimely. What follows from that? What would follow from that? Well, at that point you would actually address the degree of deference that you'd extend to the administrative appeal coordinator's decision that this was an untimely grievance, which throughout all of- Let's say we found that against you as well, and we said we don't give many deference, we give plenty of deference, but despite the deference it's still wrong. So let's say we're at that point in the process. Okay. What follows after that? The case would be remanded to the district court, Your Honor, for further evidentiary and motions. But what is the consequence of a finding that the appeals process, that you filed a proper grievance for time of grievance and it wasn't considered? Does the case then get sent back to the prison for them to consider the grievance, or does the case then proceed in district court on the merits of the 1983 claim? Actually, in the instance of a motion dismissed based on exhaustion, it's dismissed without prejudice, so the inmate can then go back and properly exhaust the complaint, which in this case would seem to- I don't think you understood my question. Let's say you lose on all that. We say he did exhaust because the appeals counsel was wrong in his determination. Does the district court then proceed to consider the merits of the 1983 claim, or is it some obligation to send it back to the prison authorities to consider the grievance as having been timely filed? Well, two points, Your Honor. If you found that the- I give you either a choice. Sure. Is either of those choices acceptable, or do you have some other possibility? I thought I had exhausted the universe of possibilities for those two choices, and that one or the other ought to be acceptable, but maybe I'm wrong. Is there some other possibility I haven't thought about? If exhaustion- You can go forward with the case in district court, or you can send it back for them to consider the grievance. You think that pretty much exhausts possibilities? That seems to be the world of possibilities. So you don't have a third possibility? No, Your Honor. Okay. Do you think one of those is right and one of those is wrong? I think the case would be sent to the appeals coordinators to properly exhaust the complaint if it had stand-in at that point. Okay. So at that point, the remedy would be send it back. Is it the district court's authority to send things back, to remand things back to administrative boards of prisons? Well, normally- Or, you know, the alternative is to say, well, you know, the state got a chance to consider the grievance. It was timely. They were wrong. Too bad. We proceeded in district court with considering the merits of the client. That's another possibility, right? Well, Your Honor, in answer to the question, if there were a mistake and it were deemed properly exhausted, the district court would then directly address the case. But if it were deemed not properly exhausted, it would be sent back to the prisons for proper exhaustion to follow. In this case, there was not proper exhaustion. He never took it up to four tiers of the appeals that California holds out in its corrections department. Well, you agree that if you filed a timely grievance, if we determined he filed a timely grievance, that they were just wrong in saying it's untimely. Put your mind to that possibility. Then the district court would address it on the issues. On the merits. Correct, Your Honor. It wouldn't get sent back. No. Okay. Okay. Any further questions? We have First Amendment claims involved here. Yes, Your Honor. Do you know why a prisoner only gets 15 days to file a grievance? The Supreme Court noted the U.S. amicus brief in this issue that departments of corrections afford between two to four weeks. California affords three weeks. And they didn't express any umbrage with these deadlines. In fact, they expressed the distinction between filing a federal court, the relative ease of filing the administrative grievance. You point out the problem and the action requested, like ordering dinner. I'm hungry. I'd like the filet mignon. And the menu that you would. I'm hungry and I'd like what? The filet mignon, Your Honor. I'm taking an order. I'm hungry and I'd like what? The filet mignon. You might prefer the fish, Your Honor. Oh, filet mignon. And in Mr. Noe's case. I think you want to get filet mignon on that bill. And then in only limited circumstances. Truly. But nobody wants filet mignon anymore. I do occasionally order it, Your Honor. When should he have filed that? It would be on. When should he have filed that form 602? He was informed of the clear decision restricting him on December 22, 2000. In his case, 15 working days worked out to 25 calendar days. There's something on that date. No doubt about it. Let's say he's just not sure. He says, look, they told me there's some sort of restriction. I'd like to look at my file. Is there some way he can figure out what exactly this was? Absolutely, Your Honor. If he was alleging improper procedure on behalf of prison officials, that is precisely what the administrative grievance process is here to address. To fill out the evidence, to try to resolve it before it ever gets to court. But let's say he doesn't know whether it's improper or he doesn't even know what exactly the scope of restriction is. Somebody walks up to him and says, you've been restricted for special programs. Normally, if you've got a social security decision, any kind of administrative decision, usually an immigration case, you usually get a piece of paper that tells you, here's what's been done to you, and here are your rights. Now, let's put aside the here are your rights part. Somebody walks up to him and says something. Is there some way in which he can figure out what that something is? How does he know whether he even got a complaint? If Mr. No were ambiguous, he would then ask the official, what do you mean by something? And if he didn't get a reasonable response, he would file an administrative grievance. What something? What's happening? He can't look at his file, right? Excuse me? He can't demand to see his file. They are actually allowed to see their non-confidential C files, absolutely. And let's say he made a demand to see the non-confidential C file. Would this restriction be in there? I don't know, Your Honor. I'm sorry. The evidence has not been developed in this case. I don't know. This is the first time I hear that there's a confidential and non-confidential C file. I don't even know what a C file is. But what kind of things are in the non-confidential C file? Would this kind of thing be in the non-confidential C file?  Anyway, so if a prisoner wants to see his non-confidential C file, as you call it, what does he do? He would ask his correctional counselor to review it, and he would be provided. They would provide him access to it? Correct. His counselor is who? I don't know who Mr. No's correctional counselor was. Is it this guy that wrote the – I'm still trying to figure out who the guy is that wrote the letter on July 9th. That was Lieutenant Kane. He was the associate warden at San Quentin. No, I'm talking about – July 9th, it was signed by Kenneth Hurdle. Ombudsman. Who is he? I don't know, Your Honor. And what function did he have in this process? I don't know, Your Honor. I haven't seen the letter you're discussing. It's in the file. July 9th? I don't think I just made it up. I don't think you made it up either, but it's not in the files I've reviewed. I'm pretty sure I saw it somewhere. Could you repeat the name of the – Hurdle. H-U-R-D-L-E. Hurdle. What was the date of the letter, Your Honor? July 9th. I don't think I have it somewhere different than this. You or he, Your Honor? I don't, Your Honor. If you'd like me to review the letter. Let me answer this. Restrictions – it's not uncommon for restrictions to be placed on inmates, is it? No, Your Honor. Now, what's the process that's followed in doing that? For an administrative segregation or a similar procedure, Hewitt by the Supreme Court establishes the degree of – You know, in this case here, what would be the normal procedure? You would have notice of the charges and an opportunity to be heard by the critical decision maker, which in this instance was Mr. Kane, giving him the decision. And all this was here, and the decision by the prison just needs to be supported by some evidence. What were the charges? I still don't know what they were. Sexual misconduct with a state volunteer at the prison chapel. Are those the charges why he's getting the restrictions? That's my understanding, Your Honor. The only ones? That's correct, Your Honor. The ones that they can't prove but they have in a secret file, maybe they can. That's correct, Your Honor. Well, okay. Normally, with an inmate where restrictions are placed on them, there's a – I mean, is something put in the file? Where the assistant warden would say, well, these restrictions were imposed on this inmate and put it in a file? I would expect that to be the case, but I cannot give an affirmative answer as to what happened in this case. Is it the general practice there to just communicate these restrictions to an inmate verbally? Verbally and not in writing? Any moves into administrative segregation and follow-up meetings would be recorded and kept in the C-file, Your Honor. Do you have this thing called excerpts filed on August 13, 2004? Is this appellant's or palliative's excerpts from the record, Your Honor? Well, it must be appellant's because I would have hoped that the state didn't prepare anything like this. I actually reviewed every page of both, Your Honor. Well, then you should have run a Kenneth Hurdles letter. It's marked as Exhibit B in this thing called excerpts. See, I can now give you some. I appreciate that, Your Honor. I'm not afraid. You can come here. You're not carrying a gun on you, are you? You can have this back, too. Well, I'm sure we have copies. Anyway, you got that thing? The Kenneth Hurdle letter. Thank you. These are attachments to the appellant's brief before this court the previous time it was heard. Exhibit B attached to the appellant's informal brief? I guess so. I guess this is the informal brief submitted by Mr. Noh on the previous appeal. Do you have it, Your Honor? No, Your Honor. But I'm happy to respond to it. Okay. Exhibit B. This seems to be confirmation from a San Quentin official as to the affirmation of the charges against Mr. Noh for his sexual misconduct and enforcing the decisions that restrict him from special programs. I'm not sure what an ombudsman is, but it sounds important, Your Honor. Well, is this a step in the administrative process? This is not a step held out by Title 15 for the formal appeals procedure, no, Your Honor, unless this was a consequence of the appeals process, but since it never went forward, it couldn't be. Okay, so you can't shed any more light on this than it says on its own face, huh? Unfortunately, no, Your Honor. What does it say? Just to refresh your recollection. This is in response to your letter to this office concerning your programming. Specifically, you are alleging that you are being denied access to religious programs. As you know, an investigation was conducted as to inappropriate behavior between certain religious volunteers and CDC inmates. Although the original allegations were not sustained, enough information was developed to indicate an over-familiar relationship had developed. In fact, based on recent conversation with the warden, additional inappropriate behavior by volunteers was discovered. I have personally reviewed the investigation and agree with the findings. I will review additional information later this week in discussion with Sam Quentin's staff. In fact, it was determined that some restrictions have been implemented to prevent further inappropriate behavior. I am recommending that you once again discuss this issue with the warden or Chief Deputy Warden, that's Defendant Kane, for clarification of the restrictions. This now brings closure to our involvement in this issue. Does what? It brings closure to our involvement in the issue. This was an ongoing investigation into the charges of sexual misconduct. Who is our involvement? Excuse me, Your Honor? I'm a little hazy on this, bringing closure to our involvement in the issue. It seems like there was some process going on here, of which Kenneth Hurdle was... This letter was a determination of process. It sounds to me as though Hurdle had been asked to look into this, and he had reviewed evidence. He says he's going to review additional evidence later in the week, and after some discussion, he decided this is okay, and he's not involved anymore. So it's just some sort of ongoing process. My guess is would this be with the ongoing investigation for disciplinary charges against the inmates to see what further steps might be done. In this case, he just reaffirmed Defendant Kane's original bar from special services. Now, the prisoner is no longer askew, right? That's my understanding, Your Honor. The case is not moot because he's seeking damages? Actually, one of the arguments for this report was that this case was moot, but they never reached a decision. I noticed that, and I'm just wondering why this wasn't pressed here. It's not being pressed now. The mootness, after all, comes from somewhere else, like death. Well, to the extent that a mootness argument isn't waived, I suppose I would raise a mootness argument. You can't waive mootness. Are you kidding? I thought the district court would address mootness if this were remanded for further proceedings. How could you possibly waive mootness? Well, for argument before this Court. How could you waive mootness? It's a jurisdiction question. Is your position that the case is moot? I don't have enough evidence to assert that position right now. But he's not at SQI right now. I don't think he is. And do we know whether the constriction applies has followed him to wherever he is now? I don't think it would have, Your Honor. Do you think it would be a good idea just to remand this all back to the district court and make findings in all these questions we have? I would think that's not necessary, given the 178 delay in affording himself with the administrative appeals process. My answer is it's not a good idea. If you think that Mr. Noe did attempt to properly exhaust his grievance, then my answer is yes. When does this grievance procedure begin? With the filing of an informal grievance? That's correct. You fill out the Form 602 and you write down. Well, that's not informal, is it? It's called informal, Your Honor. It's called informal. That's the moniker associated with it. You would hand the 602 to an official who would review your description of a problem and requested action. If you have difficulty writing in English, someone would help you fill out the Form 602. Every opportunity is afforded the inmates to get to the administrative grievance process. The line goes letter to the deputy warden. That's the informal phase. No, Your Honor. That's not a Form 602. That is correspondence personally between Mr. Noe and Defendant Kane. How do you define formal and informal? By Title 15, Your Honor. It supplies the names and stages of each grievance proceeding that it affords. Who is Title 15? That's Section 3084 entirety of that section, Title 15. It supplies all the appeals procedures. So how do you define informal? You fill out the Form 602, describe a problem and the action you want taken to resolve it. Someone reviews it. So that's informal. What's informal? If you don't like what was done at the first stage, you would submit it for further investigation. It would go to the warden. And if the warden rejected it, then it would go to the Office of Administrative Appeals for a final decision at the court level. It depends on the heading of the form, is that it? It's the same form, Your Honor. It's just you proceed to fill out different parts of the form for each rejection or if you're not satisfied at each stage. All right. You're having a good time here today. I hope we all are, Your Honor. Well, I appreciate your help. I appreciate your time. It's not an easy case. No, Your Honor. It's not an easy case. All right. Thank you very much. Thank you. All right. Mr. Meier. You had some light. All I wanted to add, Your Honor, is that on mootness, there is a damages claim that would prevent it from being moot. And I also think that there have been times since being transferred from San Quentin that Mr. No has then been housed again in San Quentin, and restrictions have applied. And what happened again then? I believe that he was transferred out of San Quentin, but then for various reasons, there have been periods when he has again been housed in San Quentin so that the restrictions can be applied to him when he is. I think he had possibly a court date in the San Francisco area and was transferred for that reason. So I don't think that they're being applied in his current place of incarceration, but they do apply when he is back at San Quentin. But, again, this is not based on something in the record. This is based on my understanding just from speaking to Mr. No subsequently. But in any event, I would think that the damages claim alone is enough to preclude any finding of mootness. Other than that, I don't have anything to add. Did you hear the admission in his complaint that he was aware of the restriction as of the day after he was imposed? This is the document that the opposing counsel showed me. I think the critical point is that he was not given a, this was not imposed for all that appears as a permanent restriction. And in the absence of that, where it's something that is, that appears to have been imposed in a relatively informal way without a written finding and not, and there's no indication he was told it was permanent, then it is something that is at best indefinite to continue for some time and it's not a, and to be reconsidered. It's not a one-time decision, as in the case that the defense relies on, where this court specifically said in a couple of places that the cause of action accrued when the letter was sent saying that it was a permanent and complete suspension of the attorney's rights. Prior letters had been sent in that case that were sort of interim suspensions. That was not when the court said that the cause of action accrued. It was only when there was a permanent decision made. Here, you don't have that, and so it's not a one-time decision extending throughout his life term. But that's slightly, so I'm pretty thin. There's a restriction placed on him. He knows there's a restriction placed on him. If he wants to find out more, he can find out more about the scope of the restriction. I mean, are you saying even the restriction, I mean, let's say if you look in the file, the restriction would say he's permanently for life barred from these special activities. So the restriction itself, as entered, is in fact permanent. But he's not told about the permanence. He's just said, let's say, you know, we've restricted you. They don't say it's temporary. They don't say how long it is. They don't say it's permanent. They just don't say. Is your position that he can, at that point, he can sort of see that he's not being permanent, and he doesn't have to inquire? Yes, Your Honor, that is our position. I think that if he's, but certainly I don't think. What are you arguing for? Are you arguing for that the inmates need to get a written notice of the time there was a restriction placed or some sort of discipline they need to get in writing? Well, frankly, Your Honor, if you're talking about something that is going to last for the duration of a life sentence and is such a broad restriction as this one, that's something that probably ought to be in writing. But even if there's not going to be a requirement that it be in writing, there at least would have to be something giving him notice that this is not how he's currently being classified, but rather that this is a permanent lifetime restriction based, I should add, on a situation where there isn't even a finding against it. But what's the end of applying? I thought, you know, looking at the Supreme Court's opinion, no. What they said is he has to have some reasonably fair notice as to what the restriction is. And why isn't it enough that they said, look, there's a restriction? And he's quite specific about what the restriction is. He says, I can't do this. He has a long list of things he can't do. So he knows exactly what the restriction prohibits. The one thing I guess is not clear is whether he knows that this is permanent or temporary or is there until they feel like changing it. Why isn't the kind of thing where they say, look, you've got to know that something like that has happened to you. If you want to know more, you've got to ask about it. You've got to ask for clarification. You've got to go look at your file. And if not, if you're not sure, you've got to leave it right there and then or else you're out of luck. Essentially, well, first of all, there's no indication that if he had looked at his file, he would have seen something that said permanent restriction. But even aside from that, for that matter, we don't know even that he didn't look at his file, although let's assume that he didn't. The Supreme Court doesn't say anything about how this is supposed to be applied. All the Supreme Court says is that Congress is creating this rule and the rule has to have teeth of essentially a procedural default sanction. But particularly when you're adding that kind of sanction to it, if you're going to say that in all instances where it's not clear what the scope is in terms of the length of time of the restriction, the prisoner has to essentially prophylactically file a grievance so that if it does turn out to be something that lasts permanently, that he can preserve his claim, all you're doing then is encouraging what will probably be unnecessary use of process, triggering formal process in a lot of cases. It's not the state's problem. If they want to have extra paper, then that's their problem. They can make a different procedure. I'm happy with that. It doesn't cause a prison anything. There's no filing fee. You get a free form. They even provide a translator if you can't speak English. If you can't write, they get someone to write it for you. So what's the big deal? Is he busy going to his job or something? He's got nothing else to do. What's the problem with having them file a piece of paper saying, look, there's a restriction. I've been told there's a restriction. It's a very serious restriction. I know that it prohibits me from doing all these things that will keep me from going on probation, and I can't find out whether it is, how long it will last, and I'll agree with it. And maybe the grievance process will say, well, we see what's going to go for six months. Well, first of all, there's nothing here indicating that maybe this is permanent, maybe not, and it's something that he can find out. All the indications here, if anything, is that it was something that was a measure taken at the time that was going to be subject to reconsideration. But you're also one reason for the prisoner not doing it is if you assume a prisoner who doesn't want to be a troublemaker and wants to essentially take his medicine and say, I'll accept the restriction, and at the appropriate time it will be reconsidered, and I'll deal with it that way. You're essentially forcing him into a situation of confrontation with prison officials, which there is going to be a disincentive for a lot of prisoners to put themselves in that situation. And you also have a situation where there is nothing indicating to the prisoner in advance that the rules this way so that he loses all ability to even file a grievance or his federal lawsuit based on the fact that in response to this unwritten notice to him that he was going to be restricted when he got out of administrative segregation that they're going to say, you know, if you didn't do it right then, then you're forever barred from doing it. Let me ask you this question. What would you like us to do for you? Well, I think that the appropriate thing would be a determination that the prison grievance coordinator was not correct in rejecting this. And in the cases where the prison has one way or another inappropriately failed to make the grievance system available, it doesn't get then remanded for the grievance to go back. It simply, the case proceeds in the district court. And I think that that is what we're asking for here. Well, when would the 15-day period start to run in your view? The 15-day period would start to run here. Again, we think it's ongoing. But I would say if there had been a... Forget about the ongoing. When do you think? Well, I think that if he had gotten a final determination from when he wrote to the warden, and the warden wrote back saying that, you know, this other official has authority to address this. Had he gotten a decision from that other official, then you can have the 15-day period start to run then. Here, because he didn't get a response, I don't think the 15-day period really started to run because he didn't get any ruling on his request to lift the restrictions. Do you think based on this record we can do what you want? Or should it go back to the district court to make findings of all these questions that we've been discussing for the last hour? I think that based on the record the court could do what we're asking for, but that certainly if the court is not prepared to do that, that the appropriate thing would be to remand to develop a record on all these questions. Well, what's the record that supports your preferred view? When did the 15 days start to run? Well, I think the record is what you have here with the letter to the warden, to the deputy warden. Tell me when it started to run. Well, I think that it essentially did not start to run because he didn't get a final decision on his request to lift the restrictions. It never started to run. It never started to run here. Yes, Your Honor, I think that's right. It's still open. Not at that. Yes. The 15-day start, that has not occurred yet. Yes, Your Honor. So why is that? Because this is something, I mean, I think that to the extent that there is a complaint about the original period of time until the letter to the deputy warden, then the time ran on that. But once he filed a request with the deputy warden to have the restrictions lifted, then on his complaint about those restrictions being imposed on him on a continuing basis from that point on, I don't think the time has run on that period of time. Because that other aspect was being considered by this other person. Yes, because he did grieve about it essentially. He filed an informal request for what the prison appears to have treated as an informal request and never got an answer. So it still hasn't run. Right. I don't think he can say now I shouldn't have been restricted, you know, on December 27th and December 28th and December 29th, when he was willing to accept that at the time without filing a grievance. But once he does file the grievance for the continuing decision to restrict him, or does file with the deputy warden, then I don't think his time starts to run on that until he actually gets a decision on it, which he didn't get. Okay. All right. I don't understand why you think that. I mean, there is this grievance process, right? What does this query incorporate that the deputy warden has to do with starting the time to run for purposes of the Davis process? Because it would be the – this would be essentially his complaint or his request to have this ongoing decision to restrict him stop, that it was no longer justified to the extent that it was ever justified. And there is a decision that's being made on an ongoing basis to continue the restrictions. So the – his calling it to the attention of prison officials and essentially starting the machinery in motion is what that has to do with the grievance process. He is complaining about the decision to continue the restrictions. I'm a little baffled by that. I'm just not following at all. When somebody gets thrown in prison, there's a trial and a sentence. There's a position of sentence, right? And let's say he's given a 20-year sentence, and he forgets to appeal. Can he then sort of try to say, well, you know, I didn't know the sentence was going to be there for 20 years. I asked the right to residency judge asking to register the sentence. Does that sort of start a new appeals process? I don't know. Well, he can't because it takes 20 years. If it's permanent, it's something that's maybe temporary by asking for reconsideration. Because it wasn't permanent. In your example, it's 20 years. By its terms, it doesn't say it's restriction that's going to end tomorrow or in six months or in three months or in six years. It just says, this prisoner no longer has these rights. Bam, that's it. What more does it need to say? But I don't think that it's a decision that this prisoner no longer has these rights. This prisoner is given a restriction. And what more there is to be said is you're permanently restricted. It's one thing to take a disciplinary measure and say you're going to be restricted, but based on the way things are now. I mean, particularly since this was not a sanction based on a finding. This is not a penalty imposed now. It doesn't matter what it's based on. They can do it. They don't need to have a violation. And if he doesn't like it, if he doesn't think it's justified, he can grieve it. That's what the grievance clause is about. Say, look, you imposed this thing. You didn't even find me, you know, in flagrant of the victor. You know, what about it? You think I was dealing with that priest? It wasn't him. That's what grievance is for. I think it does depend what it's based on. Because if something is being imposed as a penalty for particular conduct that has occurred, then that's been found to have occurred, then maybe the defense would have more of an argument that because it's a penalty, it's a one-time thing that's imposed for something that happened in the past. But that's the justification is that for prison, for purposes of making sure that things are, that inappropriate conduct doesn't take place in the prison, we're going to put somebody on a restricted basis because of our assessment that this person is a danger of engaging in that conduct. That's something that by its nature is not a one-time decision that he's a danger for the rest of his life. That's something that is based, that lasts only as long as that determination is in place about whether he's a risk. Now, I'm not saying this is determinative, but I think that it definitely does figure into whether the reasonable understanding of the restriction is that it's going to be permanent or that it's something that we're doing for now. And I think that to the extent that this is going to turn on what was, whether the reasonable understanding of what restriction was imposed is that it was a permanent restriction, I think that's something that would require remand to the district court to address all of the circumstances about what exactly he was told, what he was told about it, what the setting was, and so forth. I don't think that's necessary because I think that under these circumstances, if he's just told you're restricted without any notice that it's permanent, that's enough to take it outside the class of cases where you're saying there's a one-time thing that has to be appealed right then. But certainly, if you're going to get into what- What would the rule of law be that would come out of your position? I think the rule of law would be- What would the holding be? The holding would be that if you have something that is imposed as a sanction of a definite scope for a definite term, then you have to file the grievance within the time limit running right then. But that if you have something that is not done for a definite term, but rather someone is put in a restricted classification of some sort, that in the absence of something demonstrating that this is a decision now and forever, the understanding is it's something that is open to reconsideration on an ongoing basis, not merely by reference back to the original decision. And so there's an ongoing decision to restrict the person. And the time for challenging that runs from the time of each ongoing decision. All right. Thank you, Your Honor. All right. The matter will stand submitted. We thank both sides for enlightening argument. And we'll now adjourn.
judges: Pregerson, Kozinski, Rhoades